# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

MIGDAL INSURANCE COMPANY, LTD.,    :   Civil Action No.: 14-cv-0700(JPO)

               Plaintiff,    :

         v.    :

THE INSURANCE COMPANY OF THE STATE    :
OF PENNSYLVANIA, and NATIONAL UNION    :
FIRE INSURANCE COMPANY OF
PITTSBURGH, PA.,    :

             Defendants.    :

-------------------------------------------------------------x


## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Andrew N. Bourne, Esq. (AB-9774)
Jonathan A. Zakheim, Esq. (JZ-7630)
BOURNE & ZAKHEIM LLP
733 Third Avenue, 15th Floor
New York, New York 10017
Tel: (646) 790-5850

*Attorneys for Plaintiff Migdal Insurance
Company, Ltd.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

      A.     Migdal and ICSOP Independently Issue Primary Insurance
           Covering Kinetics Israel .................................................................. 2

           1.     The Migdal Policy............................................................... 2

           2.     The ICSOP Primary Policy ................................................ 3

      B.     The Tower Action and ICSOP's Improper Refusal to Participate Therein ........... 5

           1.     The Tower Action ............................................................... 5

           2.     ICSOP Acknowledged Coverage with Respect to the
                Tower Action but Nonetheless Refused to Participate .............................. 7

      C.     Migdal Is Forced To Commence This Action To Obtain
           Contribution Of ICSOP's Fair Share ..................................... 9

ARGUMENT ........................................................................................................... 10

I.     APPLICABLE LEGAL PRINCIPLES OF SUMMARY JUDGMENT AND
      EQUITABLE CONTRIBUTION DICTATE THAT MIGDAL IS ENTITLED TO
      JUDGMENT AS A MATTER OF LAW .......................................................... 10

II.    THERE IS NO DISPUTE OF FACT THAT THE TOWER ACTION IS
      COVERED BY THE ICSOP PRIMARY POLICY ........................................ 12

III.   ICSOP'S ARGUMENTS THAT THE ICSOP POLICY IS EXCESS OF THE
      MIGDAL POLICY ARE MISPLACED AND MERITLESS, WHICH
      RENDERS ICSOP A CO-PRIMARY INSURER .......................................... 13

      A.     The Other Insurance Provision In The ICSOP Primary Policy Dictates That
           ICSOP Provided Primary Coverage Applies ..................................... 14

      B.     ICSOP Had Available, But Elected Not To Use, Standard-Form Language
           Specifically Designed To Render Its Policy Excess ............................ 17

      C.     ICSOP's Supposed Intention For The Migdal Policy To Be Primary
           Is Admittedly Not In The Policy And Was Not Shared By Kinetic Systems ....... 19

IV.     ICSOP'S FAIR SHARE IS APPROXIMATELY $600,000 ............................................ 21

CONCLUSION........................................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Home Ins. Co. v. Travelers Indem. Co.*,
    175 Cal. Rptr. 826 (Ct. App. 1981) ...................................................................... 20

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .............................................................................................. 10

*Avondale Indus., Inc. v. Travelers Indem. Co.*,
    774 F. Supp. 1416 (S.D.N.Y. 1991) ..................................................................... 21

*Booking v. General Star Mgmt. Co.*,
    254 F.3d 414 (2d Cir. 2001) .................................................................................. 10

*BP A.C. Corp. v. One Beacon Ins. Group*,
    871 N.E.2d 1128 (N.Y. 2007) ............................................................................... 14

*Commerce & Indus. Ins. Co. v. Chubb Custom Ins. Co.*,
    89 Cal. Rptr. 2d 415 (Ct. App. 1999) ................................................................... 14

*Federal Ins. Co. v. MBL, Inc.*,
    160 Cal. Rptr. 3d 910 (Ct. App. 2013) ...................................................... 12, 13-14

*Fireman's Fund Ins. Co. v. Maryland Cas. Co.*,
    77 Cal. Rptr. 2d 296 (Ct. App. 1998) ................................................................... 13

*Great Northern Ins. Co. v. Mount Vernon Fire Ins. Co.*,
    708 N.E.2d 167 (N.Y. 1999) ................................................................................. 15

*Md. Cas. Co. v. W.R. Grace & Co.*,
    218 F.3d 204 (2d Cir. 2000) .................................................................................. 11

*Nat'l Union Fire Ins. Co. v. Am. & Foreign Ins. Co.*,
    CV 04-7257 PA(PLAx), 2006 U.S. Dist. LEXIS 96778,
    2006 WL 4757339 (C.D. Cal. Feb. 8, 2006) .................................................. 16, 19

*Nat'l Cas. Co. v. Vigilant Ins. Co.*,
    466 F. Supp. 2d 533 (S.D.N.Y. 2006) ................................................................... 11

*Nat'l Union Fire Ins. Co. v. Hartford Ins. Co.*,
    677 N.Y.S.2d 105 (App. Div. 1998) ...................................................................... 11

*Pan American World Airways, Inc. v. Aetna Cas. & Surety Co.*,
    505 F.2d 989 (2d Cir. 1974) .............................................................................. 18-19

*Reyes v. Metromedia Software, Inc.*,
   840 F. Supp. 2d 752 (S.D.N.Y. 2012) .................................................... 17

*Safeco Ins. Co. of Am. v. Robert S.*,
   28 P.3d 889 (Cal. 2001) ........................................................................ 18

*Scottsdale Ins. Co. v. Century Surety Co.*,
   105 Cal. Rptr. 3d 896 (Ct. App. 2010) ................................................. 11

*State Farm Fire & Cas. Co. v. LiMauro*,
   482 N.E.2d 13 (N.Y. 1985) .................................................................. 13

*Travelers Cas. & Surety Co. v. Employers Ins. of Wausau*,
   29 Cal. Rptr. 3d 609 (Ct. App. 2005) ................................................... 14

*Vigilant Ins. Co. v. Employers Ins. of Wausau*,
   626 F. Supp. 262 (S.D.N.Y. 1986) ....................................................... 11

*Weiss v. La Suisse, Societe d'Assurances sur la Vie*,
   293 F. Supp. 2d 397 (S.D.N.Y. 2003) .............................................. 21-22

*Zalkind v. Ceradyne, Inc.*,
   124 Cal. Rptr. 3d 105 (Ct. App. 2011) ................................................. 17

**Statutes**

Israeli Insurance Contract Law Section 59(d) (1981) .................................. 21

**Rules**

Fed. R. Civ. P. 56(c) .................................................................................. 10

# PRELIMINARY STATEMENT

This is an action for contribution against an insurer for its fair share of the defense and settlement costs incurred by a co-insurer. Those costs relate to an underlying lawsuit brought by the subrogee of Tower Semiconductors Ltd. ("Tower") against plaintiff Migdal Insurance Company ("Migdal") and defendant The Insurance Company of the State of Pennsylvania ("ICSOP"), as well as their joint-insureds, Kinetics Systems Israel Ltd. and Kinetics Process Piping Israel Ltd. (collectively "Kinetics Israel"). The underlying lawsuit alleged that Kinetics Israel negligently damaged property belonging to Tower (the "Tower Action"). Migdal honored its obligations to Kinetics Israel. ICSOP refused to do so, even after acknowledging that the Tower Action stated a claim covered under its policy. As a result, Migdal shouldered the entire burden of a loss separately insured by both Migdal and ICSOP. Black letter law dictates that ICSOP should contribute to the costs Migdal incurred with respect to the Tower Action.

ICSOP contends that it paid nothing towards the claim it was obligated to cover because its policy was supposedly "excess" of Migdal's, and thus did not impose an obligation to respond until Migdal paid its policy's entire limit of liability. Yet, ICSOP's position finds no support in the language of its policy, or any basis in law or fact. ICSOP's policy expressly provides "primary insurance" except in limited situations not present here. Nothing in ICSOP's policy states that Migdal's insurance should response first (or exclusively), or allows ICSOP to sit on the sidelines until after Migdal shouldered the entire loss.

ICSOP's position also does not comport with the understanding of the insured. ICSOP likely will assert that its policy was always intended to sit above Migdal's, in reliance upon a single document in its files concerning a temporary binder of insurance that had expired at the time of the loss. However, ICSOP admits that its policy does not reflect this supposed intention.

1

Moreover, when ICSOP first informed the insured of this interpretation, the insured responded immediately to state that ICSOP's view was categorically "incorrect."

Simply put, under the plain language of ICSOP's policy, ICSOP is a primary insurer of Kinetics Israel alongside Migdal. Because ICSOP and Migdal are joint-primary insurers, Migdal paid more than its fair share of the costs related to the Tower Action, and is entitled to remuneration from ICSOP. ICSOP's policy provides the formula for determining its fair share, and requires ICSOP to contribute in proportion to its limits. Pursuant to this proportional formula, one-third of the loss, or approximately $600,000, should be allocated to ICSOP.

## STATEMENT OF FACTS

### A. Migdal and ICSOP Independently Issue Primary Insurance Covering Kinetics Israel

This contribution action stems from three sets of relevant facts: those concerning the insurance policies issued by Migdal and ICSOP, and those underlying the Tower Action. No material facts are in dispute, only the legal obligations of ICSOP under the terms of its policy.

#### 1. The Migdal Policy

Migdal indisputably issued primary insurance covering certain third-party liabilities of Kinetics Israel. For the policy period of January 1, 2004 through December 31, 2004, Migdal issued a general liability insurance policy, No. 340001368/04, covering Kinetics Israel and its subsidiaries and affiliates (the "Migdal Policy"). (Declaration of Andrew N. Bourne, dated January 12, 2015 ("Bourne Decl."), Ex. 1 (MIGDAL000001-23)). The Migdal Policy provided Kinetics Israel with $4,000,000 in aggregate coverage, including $2,000,000 of third-party liability coverage "[f]or all damages in connection with a single occurrence or occurrences arising from a single cause of from a single originating cause, due to bodily injury and property damage." (*Id.* at MIGDAL00004).

Migdal agreed, by way of an "Extension" in the Migdal Policy, that its insurance

constituted primary coverage over other insurance arranged by Kinetics Israel:

> It is agreed that the cover under this policy constitutes primary cover and will
> apply before any similar cover which has been arranged by the insured under
> the Third Party Liability section of the policy in any other property and
> liability insurance arranged by the insured.

(*Id.* at MIGDAL000019).  As indicated by the plain language of this provision, the Migdal

Policy applied before other property or liability insurance arranged by Kinetics Israel.  Notably,

this provision does not say that Migdal's obligations were primary to any insurance issued to or

arranged by some other party, such as Kinetics Israel's parent company, Kinetic Systems, Inc.

("Kinetic Systems").

## 2.    The ICSOP Primary Policy

ICSOP also indisputably provided primary insurance covering Kinetics Israel's third-

party liabilities at issue in the Tower Action, through a policy purchased by Kinetic Systems.

ICSOP issued a foreign comprehensive general liability insurance policy, No. 80-0264926, to

Kinetic Systems for the policy period of August 30, 2003 through August 30, 2004 (the "ICSOP

Primary Policy").  The ICSOP Primary Policy covered the non-U.S. liabilities of Kinetic

Systems and its subsidiaries on a primary basis up to a $1 million limit of liability, except in

certain narrowly defined circumstances.[1]   (Bourne Decl., Ex. 2 (ISOP-CL 02975-03024)).  As

ICSOP's claims handler admitted at the time of the Tower Action, "ICSOP (Primary) and

---

[1] The ICSOP Primary Policy covered Kinetics Israel because the ICSOP Primary Policy defined "Named Insured" to include "any subsidiary, associated, affiliated, or acquired company or corporation (including subsidiaries thereof), of which any insured named as the Named Insured on the Declarations Page [Kinetic Systems] has more than 50% ownership interest in or exercises management or financial control over." (*Id.* at ISOP-CL 03020).  ICSOP acknowledged that Kinetics Israel qualified as a "Named Insured" under the ICSOP Primary Policy.  (Bourne Decl., Ex. 3 (ISOP-CL 00163-64)).

National Union (Excess) issued policies to [Kinetic Systems] under which Kinetics Israel is also covered." (Bourne Decl., Ex. 4 (ISOP-CL 02396)).

Pursuant to the ICSOP Primary Policy, ICSOP agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . property damage to which this insurance applies." (Bourne Decl., Ex. 2 at ISOP-CL-02977). The ICSOP Primary Policy also imposed on ICSOP "the right and the duty to defend the insured against any suit seeking those damages." (*Id.*) ICSOP's obligations under the ICSOP Primary Policy applied to all property damage "that takes place in the coverage territory," (*Id.*), which, as defined, included anywhere in the world except the United States and those countries under U.S. economic and trade sanctions. (*Id.* at ISOP-CL 02992).

According to its plain language, the ICSOP Primary Policy provided third-party liability coverage on a primary basis, except in the few limited circumstances outlined in its "Other Insurance" clause. The ICSOP Primary Policy's Other Insurance clause states:

> If other valid and collectible insurance is available to the Insured for a loss we cover under Coverage A or B of this Coverage Part, our obligations are limited as follows:
>
> a.    Primary Insurance
>
> This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

(*Id.* at ISOP-CL 02989). Thus, under the plain language of the ICSOP Primary Policy, unless an exception in the Other Insurance clause applies, ICSOP's "insurance is primary."

The exceptions listed in the ICSOP Primary Policy's Other Insurance clause are narrow and not applicable here. The excess provision, found in subsection "b.", states that the ICSOP Primary Policy is "excess over: (1) any of the other insurance, whether primary, excess,

4

contingent or on any other basis" for particular types of coverage. (*Id.*). In its answer, ICSOP alleges that the Migdal Policy qualifies as two types of insurance listed in section "b." The first would render the ICSOP Primary Policy excess of the Migdal Policy if the Migdal Policy constitutes "Fire, Extended Coverage, Builders' Risk, Installation Risk, or similar coverage for your work." (*Id.*). The second would render the ICSOP Primary Policy excess of the Migdal Policy if the Migdal Policy constitutes "[a]ny of the other insurance or your self-insurance plan that that [sic] covers a loss on the same basis." (*Id.*).

The ICSOP Primary Policy also contemplates the possibility that ICSOP will cover a loss alongside another insurer, and provides a method for cost sharing. (*Id.* at ISOP-CL 02989-90). In such circumstances, which are routine, section "c." of the ICSOP Primary Policy's Other Insurance clause states that ICSOP will contribute to a loss on an equal basis if the other insurance permits contribution by equal shares. (*Id.*) If the other insurance does not permit equal sharing, then the Other Insurance clause requires ICSOP to contribute based on the ratio of the co-insurers' applicable limits of liability. (*Id.* at ISOP-CL 02990). All Migdal seeks in this action is the application of this provision.

### B. The Tower Action and ICSOP's Improper Refusal to Participate Therein

#### 1. The Tower Action

In or around May 2004, employees of Kinetics Israel allegedly damaged equipment owned by Tower. (Bourne Decl., Ex. 5 (ISOP-CL 01272-73)). According to the summary in ICSOP's claims file, Kinetics Israel:

> had a purchase order from [Tower] to install gas pipes in an assembly laboratory at one of the Tower plants in Israel. The gas pipes were to be installed alongside existing water pipes. On May 30th 2004, [Kinetic Israel] personell [sic] while working on pipe installation hit the switch off valve of one of the existing pipes. The built up water pressure resulted in the pipe breaking, the valve was dislodged,. [sic] There was a sudden burst of water

> and flowed to the floors below.  [Kinetics Israel] employees tried to locate the mainswitch and had difficulty finding it.  The switch was found 20 minutes later and the water was turned off.  Unfortunately sufficient water had been discharged through an opening in the floor where the [Kinetics Israel] employees were working into a room where Tower Semi Conductor was located (clean room) and caused damage to expensive machinery.

(Bourne Decl., Ex. 6 (ISOP-CL 00543-44)).  ICSOP retained an adjuster even before a claim was made against Kinetics Israel.  (*Id.*).  After conducting an investigation, ICSOP's adjuster "determined that the property damage exposure was in the 4 million dollar range." (*Id.*).  Upon review of documents and information provided by Tower, ICSOP's adjuster found that Tower's valuation of the property damage was "in line with acceptable criteria for such an adjustment." (Bourne Decl., Ex. 5 at ISOP-CL 01278).

Initially, Tower looked to its own property insurer for reimbursement.  Intracap Insurance Ltd. ("Intracap"), Tower's ultimate insurer, made payments amounting to $2.3 million in settlement of the first-party damage.[2]  (Bourne Decl., Ex. 4 at ISOP-CL 02396).

Acting as Tower's subrogee, Intracap then sought to recover from Kinetics Israel, the allegedly negligent party, as well as from Migdal and ICSOP.  In May 2008, Intracap commenced the Tower Action in the District Court of Tel Aviv-Yafo, Israel, seeking subrogation in a lawsuit styled *Intracap Insurance Ltd. v. Kinetic Systems Israel Ltd., Kinetics Process Piping Israel Ltd., Migdal Insurance Co. Ltd., The Insurance Company of the State of Pennsylvania, and National Union Fire Insurance Company of Pittsburgh, Pa.*  (Bourne Decl., Ex. 7 (ISOP-CL 000415-23)).

The Tower Action alleged negligent damage to the property of a third party, a classic covered claim under both the Migdal Policy and the ICSOP Primary Policy.  According the

---

[2] Technically, Migdal insured Tower.  (Bourne Decl., Ex. 5 at ISOP-CL 01263).  However, Migdal merely served as a fronting insurer for Intracap, which was a wholly owned, captive subsidiary of Tower.  (*Id.*).  Intracap ultimately paid the entire loss and stood in the shoes of Tower as Tower's subrogee.

Statement of Claim Intracap filed in the Tower Action, Migdal paid Tower for the property damage allegedly caused by Kinetics Israel, and then "approached [Intracap] and demanded to receive complete indemnification" for those payments. (*Id*. at ISOP-CL 00418). Intracap went on to allege that it "indemnified Migdal for the entire amount" that Migdal paid to Tower, at which point Intracap became Tower's subrogee, and "acquired the right of subrogation against the Defendants for the amounts which it paid." (*Id*. at ISOP-CL 00419, 422). Intracap further alleged that it was "entitled to compensation … from the Defendants with regard to all of the amounts" it paid in connection with Tower's property damage claim. (*Id*. at ISOP-CL 00419). According to Intracap, the damage to Tower's property "occurred as a result of the negligent actions and/or negligent omissions of the Defendants," and thus Kinetics Israel, Migdal, and ICSOP were all liable for the loss "by way of direct and/or vicarious liability." (*Id*. at ISOP-CL 00420-22).

### 2. ICSOP Acknowledged Coverage with Respect to the Tower Action but Nonetheless Refused to Participate

ICSOP's own statements show that, internally, the only concern was whether the ICSOP Primary Policy was excess of the Migdal Policy, and never any question that the Tower Action otherwise set forth a covered cause of loss. In fact, ICSOP's claims diary contains a contemporaneous note stating: "There is no question that the damage was caused by Kinetics [Israel] employees to semiconductors Tower owned. We are at this time also in agreement to the amount of the damages. The remaining issues are a dispute as to which insurance should apply." (Bourne Decl., Ex. 6 at ISOP-CL 00542; *Id*. at ISOP-CL00543 ("At its core this matter involves the proper allocation of coverage amongst insurance carriers regarding a property damage claim that occurred in Israel on May 30th 2004")).

If the ICSOP Primary Policy were intended to be excess, then, given the contractual nature of insurance, both parties to the policy would have had to share that view. Correspondence between ICSOP and its policyholder, Kinetic Systems, demonstrate that such a mutual understanding did not exist. In the reservation of rights letter ICSOP issued after receiving notice of the Tower Action, ICSOP admitted that the Tower Action was "a suit seeking damages because of property damage as defined by the [ICSOP Primary] Policy." (Bourne Decl., Ex. 3 at ISOP-CL 00162-67). ICSOP went on to assert, however, that the ICSOP Primary Policy was not primary with respect to the Tower Action, but rather "excess over" the Migdal Policy, and therefore ICSOP had no duty to defend or indemnify Kinetics Israel. (*Id.* at ISOP-CL 00166). According to the reservation of rights letter, ICSOP based this position on the Other Insurance clauses in its and Migdal's policies. (*Id.*).

Kinetic Systems did not agree with ICSOP's interpretation of the ICSOP Primary Policy. Significantly, Kinetic Systems objected immediately upon receipt of ICSOP's letter, through the same insurance broker that helped Kinetic Systems negotiate the ICSOP Primary Policy in the first place. (Bourne Decl., Ex. 8 (ISOP-CL 00160-61)). In its response to ICSOP, Kinetic Systems stated that the "letter [wa]s incorrect," and "demand[ed] that ISCOP [sic] . . . rescind [its] reservation of rights." (*Id.*). At the time of this correspondence, ICSOP understood that Migdal had already acknowledged its obligations, and "appointed" counsel to defend Kinetics Israel in the Tower Action. (Bourne Decl., Ex. 3 at ISOP-CL 00162). Thus, Kinetic Systems had no incentive to dispute ICSOP's position – other than to correct ICSOP's mischaracterization of the parties' true intentions, as reflected in the language of the ICSOP Primary Policy.

ICSOP's own claims file further demonstrates the ICSOP Primary Policy does not contain support for ICSOP's position.  The file notes that ICSOP issued a binder stating, "Kinetics entities in France, Israel, and the United Kingdom have their own local policies – the AIG World Source Policy is excess and DIC."  (Bourne Decl., Ex. 6 at ISOP-CL 0543).  However, the file further explains that this "binder expired on August 30th 2003.  Unfortunately the provision which states that the ICSOP policy is excess of local policies of Kinetics entities in Israel was not incorporated into the policy itself."  (*Id.*).  Internally, ICSOP understood that its position was only "supported by the binder for the ICSOP [Primary] [P]olicy," and that the language of the policy itself offered no basis to suggest that ICSOP's obligations were excess to Migdal's.  (Bourne Decl., Ex. 4 at ISOP-CL 02396).  Yet, ICSOP claimed otherwise to Kinetic Systems at the time of the Tower Action, and continues to make those same arguments here.

In or about February 2011, without ICSOP's participation, Migdal paid Intracap $1.75 million in full and final settlement of Intracap's claims in the Tower Action.  (Bourne Decl., Ex. 9 (MIGDAL000057-60); Ex. 10 (MIGDAL000055-56)).  Migdal also incurred 216,951 Israeli New Shekels in defense fees, adjuster fees, and expert fees in defending Kinetics Israel in the Tower Action.  (*See* Declaration of Sharon Almog-Omidi, dated January 11, 2015 ("Almog-Omidi Decl."), ¶¶ 2-3).

### C.    Migdal Is Forced To Commence This Action To Obtain Contribution Of ICSOP's Fair Share

In February 2014, Migdal commenced this action for equitable contribution and monetary damages.[3]  (ECF Dkt. No. 1).  ICSOP answered and counter-claimed for a declaration that the ICSOP Primary Policy was excess of the Migdal Policy.  (ECF Dkt. No. 9). After answering,

---

[3] In the causes of action headings of the Complaint, Migdal styled its complaint as one for "equitable contribution/subrogation."  (ECF Dkt. No. 1 at 5-7).

ICSOP moved to dismiss Migdal's complaint as barred under a California statute of limitations. (ECF Dkt. No. 16). In September 2014, this Court denied ICSOP's motion and permitted Migdal's equitable contribution claim to move forward.[4] (ECF Dkt. No. 31).

## ARGUMENT

## I. APPLICABLE LEGAL PRINCIPLES OF SUMMARY JUDGMENT AND EQUITABLE CONTRIBUTION DICTATE THAT MIGDAL IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, this Court may resolve this action as a matter of law because there are no disputes of "material fact." Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine "if evidence is such that a reasonable jury could return a verdict for the moving party." *Id.* Because there are no disputes regarding the language of the Migdal and ICSOP policies, or the facts underlying the Tower Action, this action is ripe for summary adjudication.

This Court previously suggested that "the cause of action in this case is governed by California substantive law." (ECF Dkt. No. 31 at 5). Migdal respectfully maintains that this Court need not determine which state's law applies to this dispute, because "the first step in any choice of law inquiry is to determine whether there is an 'actual conflict' between the laws invoked by the parties." *Booking v. General Star Mgmt. Co.*, 254 F.3d 414, 419-20 (2d Cir. 2001) (citing *In re Allstate Ins. Co.*, 613 N.E.2d 936 (N.Y. 1993)). As there are no conflicts

---

[4] This Court determined that Migdal failed to state a claim for equitable subrogation. (ECF Dkt. No. 31 at 8). Migdal's equitable contribution claims remained pending.

between the laws of New York and California regarding the issues of equitable contribution raised by this action, this Court is free to consider the laws of both jurisdictions.

"New York law recognizes a cause of action for pro rata contribution when a co-insurer pays more than its fair share for a loss covered by multiple insurers." *Nat'l Cas. Co. v. Vigilant Ins. Co.*, 466 F. Supp. 2d 533, 540 (S.D.N.Y. 2006); *see also Md. Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 210 (2d Cir. 2000) ("[U]nder New York law, . . . when one party jointly liable on an obligation pays more than its pro rata share, it may compel the co-obligors to contribute their share of the amount paid." (citation omitted)). "Where two insurance policies provide primary coverage for the same risk, 'each company is obligated to share in the cost of the settlement and the expenses.'" *Vigilant Ins. Co. v. Employers Ins. of Wausau*, 626 F. Supp. 262, 268 (S.D.N.Y. 1986) (quoting *Federal Ins. Co. v. Atlantic National Ins. Co.*, 250 N.E.2d 193 (N.Y. 1969)); *see also Nat'l Union Fire Ins. Co. v. Hartford Ins. Co.,* 677 N.Y.S.2d 105, 110 (App. Div. 1998) ("Where two or more insurers bind themselves to the same risk and one pays the whole loss, the paying insurer has a right of action against his coinsurers for a ratable portion of the amount paid.").

Similarly, under California law, "the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others." *Scottsdale Ins. Co. v. Century Surety Co.*, 105 Cal. Rptr. 3d 896, 902 (Ct. App. 2010). "Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured." *Id.* Like New York law, equitable contribution under California law finds that that the amounts "owed by the other

insurers . . . should be shared by them pro rata in proportion to their respective coverage of the risk." *Federal Ins. Co. v. MBL, Inc.*, 160 Cal. Rptr. 3d 910, 925 (Ct. App. 2013) (citation omitted).

## II.    THERE IS NO DISPUTE OF FACT THAT THE TOWER ACTION IS COVERED BY THE ICSOP PRIMARY POLICY

There is no dispute of fact that the Migdal Policy and the ICSOP Primary Policy both covered the Tower Action.  Both policies indisputably provided third-party liability coverage to Kinetics Israel, and the Tower Action concerned a third-party liability claim.  As ICSOP wrote in its reservation of rights letter, the Tower Action was "a suit seeking damages because of property damage as defined by the [ICSOP Primary] Policy."  (Bourne Decl., Ex. 3 at ISOP-CL 00164).  There is also no dispute that Migdal made a payment in settlement of the Tower Action, which is a coverage claim.  (Bourne Decl., Ex. 9 at MIGDAL000057-60; Ex. 10 at MIGDAL000055-56).  Thus, the only dispute at issue is whether ICSOP and Migdal insured the "same risk" for the purposes of equitable contribution analysis.  As ICSOP explains in its claims diary, "[t]here is no question that the damage was caused by the Kinetics [Israel] employees to the semi conductors Tower owned.  We are at this time also in agreement to the amount of the damages.  The remaining issues are a dispute as to which insurance policy should respond."  (Bourne Decl., Ex. 6 at ISOP-CL 00542).

In fact, as discussed below, ICSOP and Migdal were both Kinetics Israel's primary insurers with respect to the third-party liabilities at issue in the Tower Action.  Because Migdal paid more than its fair share of those liabilities, Migdal is entitled to contribution from ICSOP for the costs Migdal incurred in defending and settling the Tower Action.

**III.  ICSOP'S ARGUMENTS THAT THE ICSOP POLICY IS EXCESS OF THE MIGDAL POLICY ARE MISPLACED AND MERITLESS, WHICH RENDERS ICSOP A CO-PRIMARY INSURER**

When confronted with multiple insurance policies potentially covering the same loss at the same level, and tasked with determining which policy applies first, courts invariably find the experience confounding and unpleasant.  As stated by the New York Court of Appeals:

> The anomaly involved in establishing a pecking order among multiple insurers covering the same risk arises from the fact that although the insurers contract not with each other but separately with one or more persons insured, each attempts by specific limitation upon the rights of its insured to distance itself further from the obligation to pay than have the others. The result has been characterized as "a court's nightmare * * * filled with circumlocution" compared sarcastically to the "struggles which often ensue when guests attempt to pick up the tab for their dinner companions" and produced, it has been said, judicial decisions that are "difficult to interpret and in some instances impossible to reconcile."

*State Farm Fire & Cas. Co. v. LiMauro*, 482 N.E.2d 13, 16 (N.Y. 1985) (citations omitted) (alteration in original).  Likely due to the same frustrations, the California Supreme Court has "expressly decline[d] to formulate a definitive rule applicable in every case in light of varying equitable considerations which may arise, and which affect the insured and the primary and excess carriers, and which depend upon the particular policies of insurance, the nature of the claim made, and the relation of the insured to the insurers." *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 77 Cal. Rptr. 2d 296, 312 (Ct. App. 1998) (quoting *Signal Cos. v. Harbor Ins. Co.*, 612 P.2d 889, 910 (Cal. 1980)).   However, there is one fundamental principle of equitable contribution applicable here:

> the commonsense principle that where multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor.

*MBL*, 160 Cal. Rptr. 3d at 925 (citation omitted).

To effectuate these principles and impose some semblance of order on an otherwise esoteric legal topic, courts typically review the language employed by the insurers to evaluate whether an obligation is shared. As the New York Court of Appeals stated, "[i]n order to determine the priority of coverage among different policies, a court must review and consider all of the relevant policies at issue." *BP A.C. Corp. v. One Beacon Ins. Group*, 871 N.E.2d 1128, 1133 (N.Y. 2007) (citation omitted). California courts also hold that, in an equitable contribution action between two insurers, the plaintiff's entitlement to contribution from the defendant may "turn[] on an interpretation of the [defendant's] policies and exclusions." *Travelers Casualty & Surety Co. v. Employers Ins. of Wausau*, 29 Cal. Rptr. 3d 609, 614 (Ct. App. 2005).

Here, Migdal does not dispute that it provided Kinetics Israel with primary insurance. As detailed below, a review of the ICSOP Primary Policy demonstrates that ICSOP also provided primary insurance to Kinetics Israel, which compels the conclusion that ICSOP must pay its fair share of the defense and settlement of the Tower Action.[5]

### A. The Other Insurance Provision In The ICSOP Primary Policy Dictates That ICSOP Provided Primary Coverage Applies

The only provision in the ICSOP Primary Policy that effects ICSOP's coverage obligations is its Other Insurance clause. As stated above, the plain language of the ICSOP Primary Policy provides primary coverage to Kinetics Israel unless one of the Other Insurance clause's narrow exceptions applies, and none of those exceptions is applicable here.

---

[5] Courts are empowered to review facts beyond the policy language to determine whether equitable contribution is appropriate. *See Commerce & Indus. Ins. Co. v. Chubb Custom Ins. Co.*, 89 Cal. Rptr. 2d 415, 422 (Ct. App. 1999) (holding defendant insurer responsible for contribution where equities override the terms of insurance policies with competing "other insurance" provisions). Here, however, ICSOP's alleges no other defense beyond that ICSOP's obligations are excess to Migdal's, based on the language of the policies at issue. This Court need not weigh any other equitable factors. *See, e.g., Travelers Casualty*, 29 Cal. Rptr. 3d at 614.

In its Answer and Counter Claims, ICSOP cites two provisions of the Other Insurance clause in support of its assertion that the ICSOP Primary Policy is excess of the Migdal Policy. First, ICSOP claims its obligations are excess pursuant to exception b(1)(a), which states that the ICSOP Primary Policy is excess of other "Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for your work." This argument fails under California and New York law, because courts in both states interpret this provision as applicable only to first-party property insurance, not the third-party liability insurance at issue here. For example, in *Great Northern Ins. Co. v. Mount Vernon Fire Ins. Co.,* 708 N.E.2d 167, 168 (N.Y. 1999), the Second Circuit certified a question to the New York Court of Appeals regarding the interpretation of this provision in connection with a personal injury action brought by a carpenter injured while working at the insured's apartment. Specifically, like ICSOP's provision here, the provision in *Great Northern* stated:

> "This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:
>
> "(1) *That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for 'your work.'*"

*Id.* at 169 (quoting policy) (emphasis in original). The New York Court of Appeals held that the "interests protected by the enumerated coverages [in the other insurance clause] of the Mount Vernon policy protect only property interests." *Id.* at 170. The New York Court of Appeals further held that the "Mount Vernon policy should be read as excess only in specific, enumerated circumstances where first-party property loss coverage would serve as primary indemnification for a loss." *Id.* at 171. The New York Court of Appeals therefore concluded that the Great Northern policy, which covered third-party liabilities, was "not similar to the first-party property coverages enumerated in the Mount Vernon excess clause."

Similarly, in *Nat'l Union Fire Ins. Co. v. Am. & Foreign Ins. Co.*, CV 04-7257 PA(PLAx), 2006 U.S. Dist. LEXIS 96778, at *1, 2006 WL 4757339 (C.D. Cal. Feb. 8, 2006), National Union sought contribution from American & Foreign for the settlement of an underlying personal injury action for which both insurers provided coverage. American & Foreign contended that its obligations were excess of National Union, in reliance upon the same other insurance provision as found in the ICSOP Primary Policy and *Great Northern*. *Id.*, 2006 U.S. Dist. LEXIS 96778 at *7. Rejecting American & Foreign's argument, the district court held that under California law, "[f]ire, extended coverage, builder's risk, and installation risk are all types of first-party property coverages, while National Union's coverage is for third-party bodily injury liability." *Id.* Consequently, the district court concluded that National Union's liability policy was "not 'similar' to those types of coverages and d[id] not trigger the excess insurance provision of American & Foreign's other insurance clause." *Id.*

Second, ICSOP claims that its insurance obligations are excess pursuant to exception b(3), which states that the ICSOP Primary Policy is excess of "any of the other insurance or your self-insurance plan that that [sic] covers loss on the same basis." This provision is not analyzed or even mentioned in any published court opinions in New York, California, or any other United States jurisdiction. While this Court may thus have an opportunity to address a matter of first impression, exception b(3) does not warrant serious consideration. This provision appears to concern ICSOP's obligations with respect to losses covered under self-insurance programs, and cannot apply to this dispute because, on its face, the Migdal Policy is not a "self-insurance program."[6]

---

[6] To the extent ICSOP asserts that this provision applies outside the context of self-insurance to all "other insurance ... that covers loss on the same basis" as the ICSOP Primary Policy, such an assertion is nonsensical. As discussed above, the ICSOP Primary Policy's Other Insurance clause contains carefully defined subsections rendering its coverage excess where other primary policies of certain varieties also cover a loss. To read exception b(3) as

## B. ICSOP Had Available, But Elected Not To Use, Standard-Form Language Specifically Designed To Render Its Policy Excess

The specific provisions in the ICSOP Primary Policy's Other Insurance clause cannot apply to this dispute for the reasons discussed above. However, ICSOP's reliance on this clause is also fatally flawed for a more fundamental reason: ICSOP had available, but chose not to use, standard language that would have caused its policy to operate in the exact manner for which it now argues. A standard-form endorsement drafted by the Insurance Services Office, Inc. ("ISO") explicitly provides that a primary U.S. foreign liability policy is excess of any locally issued policies. That form is widely available, frequently employed, and, in fact, recommended by ICSOP's own parent company. In a document entitled "How to Build a Multinational Program," Chartis, as ICSOP's corporate parent referred to itself in the wake of the 2008 financial crisis, highlights "a standard ISO endorsement entitled *Amendment of Coverage Territory – Worldwide Coverage* (CG 2422 10/01)," as the proper mechanism for a U.S.-based insurer to "provide for covering exposures in multiple countries." (Bourne Decl., Ex. 11 (p. 5)). This Chartis 'how-to' manual states that the endorsement allows an insurer to expand "the scope of a general liability policy from U.S.-only to a worldwide territory" while limiting the policy to "function as excess insurance over that foreign [local] insurance." (*Id*. at pp. 5-6). To do so, the endorsement amends the primary policy's "Other Insurance" provision to provide that the foreign commercial general liability policy is excess over any other insurance for a liability that "is determined in a suit brought outside the United States . . . ." (Bourne Decl., Ex. 12 (p. 1)).

---

broadly applicable to any and all other primary policies would read those provisions out of the policy, and "violate[] the cardinal rule that a contract should not be read to render any provision superfluous." *Reyes v. Metromedia Software, Inc*., 840 F. Supp. 2d 752, 756 (S.D.N.Y. 2012) (citing *Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir. 2001)); *Zalkind v. Ceradyne, Inc*., 124 Cal. Rptr. 3d 105, 116 (Ct. App. 2011).

ICSOP's position might be tenable if the ICSOP Primary Policy contained such a provision, but ICSOP failed to follow its parent's advice. Courts in California and New York recognize that if language available in the marketplace is clearer or different from that actually used by an insurer, then the language actually used by the insurer cannot be interpreted to have the same effect. For example, in *Safeco Insurance Company of America v. Robert S.*, 28 P.3d 889, 892 (Cal. 2001) ("*Safeco*"), the policyholders sought coverage under a homeowner's policy containing an "illegal act" exclusion in connection a wrongful death action brought against them after their teenage son accidentally shot and killed his friend. After a juvenile court sustained an involuntary manslaughter petition against the son, Safeco argued that the accidental killing fell within the policy's exclusion for an "illegal act." *Id.* The policyholders argued, and the trial court agreed, that the "illegal act" exclusion was reasonably construed to only include intentional illegal acts. *Id.* On appeal, the California Supreme Court found that accepting Safeco's argument would require the court to "treat the policy's clause excluding coverage for an 'illegal act' as the equivalent of a clause excluding coverage for a 'criminal act.'" *Id.* at 893. The court rejected this proposition, finding that if "Safeco wanted to exclude criminal acts from coverage, it could have easily done so. Insurers commonly insert an exclusion for criminal acts in their liability policies. Because Safeco chose not to have a criminal act exclusion, instead opting for an illegal act exclusion, we cannot read into the policy what Safeco has omitted." *Id.*

Similarly, in *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989, 993-94 (2d Cir. 1974) ("*Pan Am*"), Pan Am sought coverage under an "all risk" policy that contained a "war exclusion" for a loss resulting from an airline hijacking perpetrated by the "Popular Front for the Liberation of Palestine." The Second Circuit rejected the insurers' argument that the "war exclusion" applied to bar coverage, finding that the insurers failed to

meet their burden of proof because "[v]arious exclusionary terms in use or being considered for use prior to the present loss would have excluded the loss had they been employed." *Id.* at 1000. The court concluded that the *Pan Am* insurers were aware of those alternative exclusionary terms, because "the General Policy Committee of the USAIG, which supplied the forms for the present all risk insurance, realized by May, 1970, that 'current war risk exclusions do not appear to be effective against intentional damage such as might be caused by hijackings, by bombs placed in aircraft by political activists, by riotous acts, etc.'" *Id.* at 1001. Thus, according to the Second Circuit, "[w]hen the all risk insurers failed to exclude 'political risks in words descriptive of today's world events,' they acted at their own peril." *Id.* (citation omitted).

Based on *Safeco* and *Pan Am*, this Court should reject any attempt by ICSOP to transform its narrow and inapposite Other Insurance clause into more precise language. Like the insurers in *Pan Am*, and as demonstrated by marketing materials produced by ICSOP's corporate parent, ICSOP was aware of alternative language that would have rendered the ICSOP Primary Policy excess of the Migdal Policy. Like the insurer in *Safeco*, ICSOP chose not to use it, and this Court should not read language into the ICSOP Primary Policy that ICSOP decided to omit.

### C. ICSOP's Supposed Intention For The Migdal Policy To Be Primary Is Admittedly Not In The Policy And Was Not Shared By Kinetic Systems

Because the language of the ICSOP Primary Policy unambiguously provided Kinetics Israel with primary coverage for the Tower Action, ICSOP will likely attempt to rely upon a single piece of extrinsic evidence to claim that the ICSOP Primary Policy was supposedly intended to be excess of local policies.[7] Specifically, ICSOP is likely to rely on two sentences

---

[7] It is not entirely clear that ICSOP can rely on any parol evidence to override the unambiguous ICSOP Primary Policy. *See, e.g., Nat'l Union Fire Ins. Co.*, 2006 U.S. Dist. LEXIS 96778, at *11, 2006 WL 4757339 (assuming, without deciding, that the district court in a contribution action could look a parol evidence without first determining that the policy provisions in issue were ambiguous).

from its underwriting file, which read: "Kinetics entities in France, Germany, Israel and the United Kingdom have their own local policies. The AIG WorldSource policy is excess and DIC." (Bourne Decl., Ex. 6 at ISOP-CL 0543). ICSOP admits that this intent never manifested itself in the ICSOP Primary Policy: "Unfortunately the provision which states that the ICSOP policy is excess of local policies of Kinetics entities in Israel was not incorporated into the policy itself." (*Id.*; *see also* Bourne Decl., Ex. 4 at ISOP-CL 02396).

Without language rendering the ICSOP Primary Policy excess of the Migdal Policy, ICSOP can only prevail in this action by seeking reformation – a request that ICSOP has not pled – to reflect an intention disputed by Kinetic Systems. Even if ICSOP sought reformation here, such a request must be denied, because "[t]he purpose of reformation is to make a written contract truly express the intention of the parties. This language refers to 'a single intention' entertained by both parties." *Am. Home Ins. Co. v. Travelers Indem. Co.*, 175 Cal. Rptr. 826, 832 (Ct. App. 1981) (citation omitted). "Although a court of equity may revise a written instrument to make it conform to the real agreement, it has no power to make a new contract for the parties, whether the mistake be mutual or unilateral." *Id.* (citation omitted). "It is also axiomatic that the court cannot reform and remake a contract for alleged mistake where there was never any such common intent." *Id.* (citation omitted).

ISCOP's reliance on the purported intention found in its binder cannot support a claim for reformation because ICSOP's supposed intention was not shared by Kinetic Systems. As noted above, when Kinetic Systems received ICSOP's reservation of rights letter, Kinetic Systems stated that ICSOP's position was "incorrect." (Bourne Decl., Ex. 8 at ISOP-CL 00160-61). For ICSOP's position to reflect the true intentions of the parties, Kinetic Systems would have had to agree with it.

## IV.    **ICSOP'S FAIR SHARE IS APPROXIMATELY $600,000**

Because the ICSOP Policy is a joint-primary policy with the Migdal Policy, all that remains is the issue of allocation as between the joint insurers.  Where it is joint primary insurance, the ICSOP Policy states that:  (a) if the other insurance provides for contribution by equal shares, ICSOP will contribute in that manner; otherwise (b) ICSOP will contribute by limits "based on the ratio of the its applicable limit of insurance to the total applicable limits of insurance of all insurers."  (Bourne Decl., Ex. 2 at ISOP-CL 02989-90).  The Migdal policy is silent regarding contribution, but Israeli Insurance Contract Law Section 59(d) (1981) states that two insurers providing overlapping coverage "will bear the burden of obligations inter se in accordance with the ratio of the amounts of insurance."

As a result, ICSOP'S liability should be based on the proportion of limits issued by the primary insurers, Migdal and ICSOP.  As indicated above, Migdal provided Kinetics Israel with $2 million in primary coverage, and ICSOP provided $1 million.  Pursuant to those limits, two-thirds of the loss should be assigned to Migdal, and one-third to ICSOP.  Dividing the total amount of Kinetic Israel's loss in accordance with that ratio assigns two-thirds (or $1,167,250.00) to Migdal, and the remaining one-third (or $582,750.00) to ICSOP.  Additionally, Migdal can seek contribution for the defense costs it incurred in defending Kinetics Israel.  *See, e.g., Avondale Indus., Inc. v. Travelers Indem. Co.,* 774 F. Supp. 1416, 1437 (S.D.N.Y. 1991).  Here, Migdal incurred 216,951 Israeli New Shekels, which amounts to approximately $54,000.[8]  Therefore, ICSOP is responsible for an additional $17,000 in defense costs and expenses.

---

[8] As a court sitting in diversity, this court should "apply the currency conversion rule employed by the courts of New York." *Weiss v. La Suisse, Societe d'Assurances sur la Vie*, 293 F. Supp. 2d 397, 408-09 (S.D.N.Y. 2003) (citing *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 865 (2d Cir. 1981)).  "New York courts have adopted the 'judgment day' rule, which mandates conversion based on the exchange rates as of the date of judgment." *Id.*

## CONCLUSION

For the foregoing reasons, Migdal respectfully requests that this Court grant Migdal

summary judgment, enter judgment awarding Migdal damages in the amount of approximately

$600,000, and award Migdal such other and further relief as this Court deems just and proper.

Dated: January 12, 2014      Respectfully submitted,
   New York, New York

          BOURNE & ZAKHEIM LLP


          By: /s/ Andrew N. Bourne
            Andrew N. Bourne (AB-9774)
            Jonathan A. Zakheim (JZ-7630)
          733 Third Avenue, 15th Floor
          New York, NY 10017
          Tel: (646) 790-5850
          Fax: (646) 355-2882

          *Attorneys for Plaintiff Migdal Insurance*
          *Company, Ltd.*

---

(citing N.Y. Judiciary Law § 27(b) (McKinney, 2001)).  As of the date of the filing of this motion, the exchange rate of one Israeli New Shekel is approximately $0.254.  *See* Currency Overview, *Wall Street Journal*, http://online.wsj.com/mdc/public/page/mdc_currencies.html (last visited January 12, 2015).